`

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
SOUTHAMPTON HISTORY MUSEUM,
a New York not-for-profit, tax-exempt corporation and
chartered educational institution,

                         *Plaintiff*,

         -against-

TOWN OF SOUTHAMPTON, NEW YORK;
JAMES BURKE, in his official and individual capacity;
WILLIAM PELL, in his official and individual capacity;
MARK MATTHEWS, individually and in his capacity
as President of Conscience Point Shellfish Hatchery;
CONSCIENCE POINT SHELLFISH HATCHERY,
a New York not-for-profit corporation;
COUNTY OF SUFFOLK;
DAVID GILMARTIN, individually and in his capacity
as an attorney with Greenberg Traurig LLP;
JOHN DOES 1–10,

                    *Defendants*.
-------------------------------------------------------------------x

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Southampton History Museum ("Plaintiff" or "Museum"), by and through its undersigned counsel, alleges as follows:

## NATURE OF THE ACTION

      1.     This action arises under 42 U.S.C. § 1983 and New York law. It is both a civil rights case and a quiet title action seeking to remedy grave violations of the Due Process Clause, the Equal Protection Clause, and the Takings Clause of the United States Constitution.

      2.     This case exposes a deliberate abuse of governmental power, where municipal officials and private actors conspired to fabricate ownership records, override judicial process, and funnel public resources for private gain.

3.      The property at stake, Conscience Point, is not only Plaintiff's most valuable asset, but one of the most historic landmarks in the United States. This property is the traditional 1640 landing site of Southampton's first English settlers, featured on the Town's official seal, and has been preserved and stewarded by Plaintiff, Southampton History Museum, for more than 115 years pursuant to a duly recorded 1910 deed.

4.      Defendants acted in concert to: (a) deprive Plaintiff of property without notice or hearing, in violation of procedural due process; (b) manipulate public records in a manner that was arbitrary, irrational and conscience shocking, in violation of substantive due process; (c) effectuate a taking without just compensation by clouding Plaintiff's title, maintaining unauthorized commercial occupation, and a false claim of ownership; and, (d) treat Plaintiff differently from all other similarly situated nonprofit landowners, in violation of equal protection.

5.      These actions were not isolated errors but the product of a coordinated scheme among municipal officials, the Trustees, and private actors, carried out through interference in court proceedings, administrative manipulation of tax maps, public misrepresentations, and diversion of taxpayer funds.

6.      Plaintiff's efforts to protect its deeded rights and historic mission were met with an unprecedented and unlawful government intervention.

7.      Together, these Defendants leveraged longstanding influence within the Town and County to alter ownership records, preserve Defendant Conscience Point Shellfish Hatchery, Corp.'s rent-free occupation, and funnel public resources to private commercial shell fishing enterprises.

8.    The quid pro quo was seamless. Defendant Conscience Point Shellfish Hatchery, Corp. retained its base of operations, private subtenants enriched themselves, and the Town of Southampton declared itself the owner of land it never lawfully held any rights to.

9.    The consequences of Defendants' conduct are stark. Plaintiff was: (a) stripped of its core property rights, including the right to exclude; (b) its title was clouded; and (c) its ability to steward and fundraise for its historic mission was undermined by public disparagement of its ownership.

10.    This was not lawful adjudication but an unconstitutional taking, carried out through administrative sleight-of-hand. It is, in every sense, a textbook violation of the Due Process Clause, the Equal Protection Clause, and the Takings Clause of the United States Constitution.

11.    Plaintiff now turns to this Court to vindicate its constitutional rights and restore the rule of law. Plaintiff seeks judgment declaring and quieting title in its favor; enjoining further interference with its property; awarding damages for constitutional and common-law violations; and ordering disgorgement of profits unlawfully obtained by subtenants.

12.    Plaintiff has suffered concrete economic and reputational injury, including: (i) impairment of leasing and exclusion rights following the April 2025 County tax-map redesignation; (ii) donor and grant disruptions caused by Defendants' false public ownership claims; and (iii) litigation expense to clear title, as reflected by contemporaneous press coverage and solicitations premised on 'Town ownership.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

14.     This Court has supplemental jurisdiction over Plaintiff's state-law claims, including claims under New York common law and the Real Property Actions and Proceedings Law, pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the federal claims.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Property at issue is located in Suffolk County, New York, within the Eastern District of New York, and all of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

**Plaintiff Southampton History Museum**

16.     Plaintiff is a New York not-for-profit corporation and educational institution duly chartered by the New York State Board of Regents to operate on behalf of the State Education Department, with its principal offices located at 17 Meeting House Lane, Southampton, New York.

17.     Plaintiff is recognized as a tax-exempt charitable and educational organization under Section 501(c)(3) of the Internal Revenue Code and applicable state law.

18.     Founded in 1898 as the Southampton Colonial Society and renamed the Southampton History Museum in 2018, Plaintiff has, for over a century, preserved, curated, and interpreted the history of Southampton, New York and Long Island's East End for the public benefit.

4

19.     Plaintiff acquired title to the property known as Conscience Point in 1910 by recorded deed from Charles W. Reeve, which conveyed the historic 1640 landing site of the Town's first English settlers. The parcel is located at 1640 Conscience Point Road, Southampton, New York, and is designated on the Suffolk County Tax Map as District 0900, Section 060.00, Block 02.00, Lot 007.000 (hereinafter "Property" or "Conscience Point"). Since that time, Plaintiff has continuously held and exercised exclusive ownership, possession, and control over the Property.

20.     Plaintiff brings this action to vindicate its vested property rights, to protect the integrity of its charitable mission, and to remedy the constitutional and common-law injuries inflicted by Defendants' unlawful actions.

**Defendant Town of Southampton**

21.     Defendant Town of Southampton ("Town") is a municipal corporation organized under the laws of the State of New York and located in Suffolk County with its principal offices located at 116 Hampton Road, Southampton, Suffolk County.

22.     The Town is vested with the powers set forth in New York Town Law §§ 64, 65, and 198, including the authority to manage and control Town property, to commence and defend litigation, to levy taxes, and to administer public programs such as the Community Preservation Fund ("CPF") and Water Quality Improvement Program ("WQIP").

23.     At all times relevant, the Town, acting through its elected and appointed officials, including the Town Board and the Town Attorney, as well as its departments, employees, and agents adopted, directed and ratified a municipal policy and litigation posture falsely asserting ownership of Plaintiff's property at Conscience Point. In doing so, the Town abused its statutory

authority under color of law to cloud Plaintiff's recorded title, obstruct Plaintiff's vested property rights without due process.

24.    The Town is named as a Defendant for its municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because the constitutional deprivations and common-law torts alleged herein were committed pursuant to official policy and custom, and by final policymakers acting under color of state law.

**Defendant County of Suffolk**

25.    Defendant County of Suffolk ("County") is a municipal corporation of the State of New York with its principal offices located in Riverhead, Suffolk County.

26.    The County, acting through its Real Property Tax Service Agency ("RPTSA") and other departments, is statutorily charged under New York Real Property Tax Law ("RPTL") §§ 503–504 with the preparation, maintenance, and accuracy of official county tax maps, including the designation of ownership for parcels within the Town of Southampton.

27.    County officials with final policymaking authority over property tax records and mapping, including officers of RPTSA, thereby adopted, ratified and implemented the municipal policy that directly contributed to the clouding of Plaintiff's title, the deprivation of due process, and the perpetuation of the conspiracy alleged herein.

28.    The County is therefore named as a Defendant for its independent role in effectuating the unconstitutional and unlawful taking of Plaintiff's property rights and is collectively referred to with the Town as the "Municipal Defendants" under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

**Defendant Conscience Point Shellfish Hatchery**

29.     Defendant Conscience Point Shellfish Hatchery Corp. ("CPSH") is a New York not-for-profit corporation recognized as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code and the New York Not-for-Profit Corporation Law.

30.     CPSH conducts its operations from Plaintiff's Property at Conscience Point, specifically at 1990 North Sea Road, Southampton, New York 11968, which lies within and forms part of the Property.

31.     CPSH has knowingly participated in and benefited from the conspiracy among the Town and private actors to cloud Plaintiff's title, obstruct eviction, and convert the Property to municipal and private commercial use.

32.     CPSH is named as a Defendant for its direct unlawful occupation of the Property, for the false and adverse claims it has publicly advanced, and for its active role in the constitutional violations, common-law torts, and fraudulent schemes alleged herein.

**Defendant James Burke**

33.     Defendant James Burke ("Burke") is the Town Attorney of Southampton, appointed in 2024.

34.     In that role, Burke serves as the Town's chief legal officer, directs its litigation posture, and advises and acts for the Town Board on questions of property, title, and land use. Burke had and has exercised final policymaking authority with respect to the Town's legal positions on property ownership, tax map submissions, and related litigation strategy.

35.     Burke used his position not as a neutral legal officer, but as an architect of a fraudulent scheme, knowingly advancing false ownership claims and leveraging the Town Attorney's imprimatur to transform private advocacy into municipal policy.

7

36.    In so doing, Burke violated the New York Rules of Professional Conduct. Rule 1.2(d) bars lawyers from assisting client fraud, Rule 3.3 requires candor to the tribunal rather than collaboration in false claims, and Rule 8.4 prohibits dishonesty, fraud, deceit, and misrepresentation. By advancing knowingly false assertions of municipal ownership, he tainted the proceedings and engaged in professional misconduct.

37.    He is named both in his official capacity, for actions taken under color of state law as Town Attorney, and in his individual capacity, for his personal involvement in the constitutional and common-law violations alleged herein.

**Defendant William "Bill" Pell IV**

38.    Defendant William "Bill" Pell IV ("Pell") is a member of the Southampton Town Board having previously served for more than a decade as a Town Trustee.

39.    In his capacity as Councilman, and formerly as Trustee, Pell exercised significant influence over Town policymaking concerning property rights, grant funding, shoreline access, and municipal oversight of lands and waterways.

40.    Pell wielded his elected authority and longstanding political influence not in service of the public, but to protect CPSH, a for profit organization masquerading as a not for profit, and its commercial subtenants, and to entrench a fabricated claim of Town ownership.

41.    He is named in his official capacity, for actions taken under color of state law as a Town official and policymaker, and in his individual capacity, for his personal involvement in the unlawful conduct alleged herein.

**Defendant Mark Matthews**

42.    Defendant Mark Matthews ("Matthews") is the President of CPSH.

43.    Matthews directed the CPSH to operate well outside its charitable and educational purpose by engaging in commercial subleasing arrangements and representing in WQIP grant applications that CPSH planned to develop the hatchery for commercial use and provided dockage, storage, and infrastructure for for-profit aquaculture companies, conduct incompatible with its 501(c)(3) status.

44.    Matthews coordinated directly with Town officials, Burke and Pell, to obstruct Plaintiff's eviction efforts and to preserve CPSH's foothold on the Property ensuring that CPSH's commercial partners continued to profit from Plaintiff's land under the guise of nonprofit activities.

45.    He further engaged in prohibited "excess benefit transactions" within the meaning of Internal Revenue Code § 4958 by personally profiting from commercial shellfish operations conducted on Plaintiff's property. By using his nonprofit position to divert charitable resources and public grant funds for private enrichment, Matthews violated federal tax law, breached his fiduciary duties as a nonprofit officer, and furthered the unlawful conspiracy to dispossess Plaintiff of its historic property.

46.    He is therefore named in his individual capacity for his personal misconduct, and in his representative capacity as President of CPSH, the entity he controlled and through which much of the unlawful conduct alleged herein was carried out.

**Defendant David Gilmartin, Jr.**

47.    Defendant David Gilmartin, Jr. ("Gilmartin") is a partner at Greenberg Traurig LLP, and a former Southampton Town Attorney, a position in which he acquired unique familiarity with municipal property, shoreline disputes, and the Town's internal processes.

48.    Gilmartin acts as counsel to CPSH.

49.     Though now in private practice, Gilmartin leveraged his prior governmental role, relationships, and access to advance the interests of CPSH and its commercial subtenants in opposition to Plaintiff's vested property rights.

50.     Gilmartin's participation went beyond ordinary private advocacy: he acted jointly with Town officials to cloak CPSH's adverse claims in the appearance of governmental authority, thereby effectuating municipal action under color of state law.

51.     In so doing, Gilmartin violated the New York Rules of Professional Conduct. Rule 1.2(d) bars lawyers from assisting client fraud, Rule 3.3 requires candor to the tribunal rather than collaboration in false claims, and Rule 8.4 prohibits dishonesty, fraud, deceit, and misrepresentation. By advancing knowingly false assertions of municipal ownership, he tainted the proceedings and engaged in professional misconduct.

52.     He is therefore named in his individual capacity for his personal role in conceiving, directing, and advancing false ownership claims and for inducing unlawful municipal conduct, and in his representative capacity as counsel acting on behalf of CPSH and, upon information and belief, in collaboration with Town officials whose interests were aligned with CPSH's continued occupation of the Property.

**Defendants John Doe**

53.     Defendants John Doe 1–10 are presently unknown individuals and/or entities who participated in or facilitated the deprivation of Plaintiff's constitutional and property rights. Plaintiff will amend this pleading to identify them once their identities and roles are ascertained through discovery.

## STATEMENT OF FACTS

**Plaintiff's Ownership of the Property**

54.     In 1898, Plaintiff, formerly known as the Southampton Colonial Society, was formed for the express purpose of acquiring, preserving, and maintaining sites of historical significance in the Town of Southampton.

55.     In furtherance of that mission, particularly to safeguard and interpret the community's colonial history, Plaintiff voted in 1909 to incorporate as a nonprofit entity so that it could lawfully purchase and hold Conscience Point.

56.     In 1910, Plaintiff acquired title to Conscience Point through a recorded deed from Charles W. Reeve and his wife, Adelaide A. Reeve, to the Southampton Colonial Society, Plaintiff's predecessor name, conveying the Property in fee simple absolute (the "1910 Deed," recorded in the Suffolk County Clerk's Office at Liber 726, Page 296). The Property, located at 1640 Conscience Point Road, Southampton, New York, is designated on the Suffolk County Tax Map as District 0900, Section 060.00, Block 02.00, Lot 007.000, and consists of approximately 4.3 acres, as confirmed by a certified 2015 survey prepared by Squires, Holden, Weisenbacher & Smith, annexed hereto as **Exhibit A.**

57.     The 1910 Deed vested ownership in Plaintiff and established an unbroken chain of title to the present day.

58.     Conscience Point is a site of extraordinary historic significance. Plaintiff purchased the Property to preserve it as the traditional 1640 landing site of Southampton's first English settlers. In 2003, the Town designated it a local landmark. It remains a signature symbol of Southampton, prominently featured on the official Town seal.

59.     Plaintiff has preserved the Property in furtherance of its charitable mission for more than a century.

**Sale of Land Adjacent to the Property**

60.     On January 28, 1924, Edward B. and Marjorie Lubkert purchased the meadowland adjacent to Conscience Point from heirs of the Reeves family. The deed conveyed the tract "as were owned by Charles Reeve at the time of his death," which included the low meadow south of the Conscience Point.

61.     This meadow had its use restricted by an 1880 deed from Jeremiah Reeves, which attempted to establish a public landing place "for all the inhabitants of the Town of Southampton forever and for no other purpose" ("1880 Deed")

62.     The 1880 deed did not transfer ownership in fee to the Town. Instead, it appointed three private trustees, Lewis Scott, Charles W. Reeve, and Jetur R. Rose, to hold a portion of the meadow in trust for public landing use only. Title to the surrounding meadowland remained in the Reeves family.

63.     After the Lubkerts purchased the meadowland in 1924, a dispute arose with the Town about the right to public access and the location of the public landing described in the 1880 Deed "was not definitely and satisfactorily established and known."

64.     To resolve the dispute, the parties negotiated a new location for public access. The 1925 settlement Deed ("1925 Deed") conveyed to the Town a narrow strip of Lubkert's meadow, expressly chosen because it caused "the least injury to the said Lubkert's property." The grant was restricted in scope, "to be used as a public landing place for all the inhabitants of the Town of Southampton forever and for no other purpose."

65.    The 1925 Deed, by its express language, provided that this new description would be accepted "as for and in place of" the 1880 landing, and that all claims under the 1880 deed were abandoned and released by acceptance of the new conveyance.

66.    Thus, the 1925 Deed superseded and extinguished the ambiguous 1880 landing language, replacing it with a clearly defined strip of meadow, distinct from Conscience Point which, upon information and belief, consisted of approximately .7 acres.

67.    The Lubkerts retained exclusive ownership of the balance of their meadow, and the Town acquired rights to a narrow strip of land limited to use as a residential public landing place that adjoined but was separate and apart from the Museum's 1920 deeded Conscience Point land.

68.    The 1925 Deed did not and could not affect the Museum's ownership of Conscience Point, which had already been purchased in fee simple by the Southampton Colonial Society in 1910.

69.    Further evidence that the 1925 Deed did not and could not transfer any part of Conscience Point is found in its own recitals: (i) the deed identifies Edward B. Lubkert as the owner of the land being conveyed. Lubkert, however, only acquired property from the Reeves heirs in 1924, after Charles W. Reeve's death, and thus his ownership extended solely to the Reeves' meadowland, not to Conscience Point; (ii) Conscience Point had already been conveyed in 1910 by Charles W. Reeve himself, during his lifetime, to the Southampton Colonial Society; and, (iii) as a matter of law, Lubkert never held title to Conscience Point, and therefore could not have conveyed any portion of it in 1925.

70.    For more than a century afterward, the 1925 Deed was never understood to diminish or subdivide the Plaintiff's 1910 parcel. At no time since Plaintiff's purchase of the

Property did any Town or County official ever (i) question Plaintiff's ownership of the Property, or the boundaries of the Property; (ii) sought to map the peninsula separately; or (iii) claim title to any portion of Conscience Point.

71.    Only recently have Defendants attempted to inflate the narrow grant in the 1925 Deed into a manufactured claim that nearly two acres of Plaintiff's Property belong to the Town. This contrived interpretation finds no support in the deed itself, in contemporaneous surveys, or in historical context.

72.    The 1925 Deed was expressly limited to a sliver of meadowland to serve as a small public landing, chosen because it did the "least injury" to the Lubkerts' property. It was never intended, and cannot reasonably be read, as a wholesale transfer of multiple acres of upland or waterfront belonging to Plaintiff.

**Municipal Recognition of Plaintiff's Exclusive Use and Control of the Property**

73.    For 115 years, Plaintiff has continuously and exclusively occupied, maintained, and preserved the Property as its own, openly exercising dominion consistent with fee ownership.

74.    Successive Town and Trustee administrations, as well as CPSH itself, have acknowledged Plaintiff's title by entering into rent-free leases with Plaintiff for use of portions of the Property. Through these acts, and through Plaintiff's uninterrupted exercise of the quintessential ownership right to exclude unauthorized third parties, the boundaries and ownership of the Property have been practically located, recognized, and acquiesced in by all Defendants for more than a century.

75.    For more than a century, the Municipal Defendants unequivocally recognized Plaintiff's ownership of the Property as reflected in the 1910 Deed, on the Suffolk County Tax

Map as District 0900, Section 060.00, Block 02.00, Lot 007.000, through property tax exemptions, and by entering into leases and license agreements that expressly identified the Plaintiff, as landlord and owner.

76.     Trustees of the Freeholders and Commonalty of the Town of Southampton ("Trustees") is a municipal corporation established under colonial patent and recognized under New York law, exercise independent jurisdiction over Southampton's common lands and waterways, and historically have asserted influence over properties at and around Conscience Point.

77.     In 1987, the Trustees formally commissioned John Osborne who, upon information and belief, worked at the Suffolk County Department of Real Estate for over 18 years, to investigate the chain of title for Conscience Point.

78.     Osborne concluded that "the property definitely does belong to the Southampton Colonial Society," and the Trustees adopted this finding in their official minutes.

79.     Those minutes further record that after confirming Plaintiff's ownership, the Trustees directed one member to contact Robert Keene, President of the Colonial Society, to see what arrangements could be made to obtain the Property, underscoring that the Trustees recognized Plaintiff's ownership.

80.     Following this meeting, the Trustees formalized their recognition of Plaintiff's title by executing a written lease in 1989 for use of a portion of the Property, expressly naming the Southampton Colonial Society as Lessor and the Trustees as Lessee, for a 25-year term at nominal rent. That lease has been successively renewed, most recently on March 15, 2025, and remains in force today.

81.     In 2000, the Town reaffirmed this acknowledgment, when it again executed a lease for the use of the Property with the Plaintiff for a fifty (50) year term, again expressly identifying the Plaintiff as owner and landlord.

82.     In December 2022, the Town entered into a license agreement with Plaintiff authorizing landscaping work on the Property. By requiring Plaintiff's consent before municipal work could occur, the Town once again confirmed that Plaintiff held exclusive ownership and control.

83.     On November 22, 2024, the Town, through its Community Preservation Department, sent Plaintiff a letter inviting it to "explore the possibility of acquisition" of the Conscience Point property (the "Acquisition Letter"). By soliciting Plaintiff's consent to a potential sale, the Town expressly acknowledged that Plaintiff was the lawful owner and that any municipal interest in the Property could be secured only through just compensation, not by unilateral assertion of title. A true and correct copy of the Acquisition Letter is annexed hereto as Exhibit B.

84.     Throughout this period, the Town continued to assess and grant Plaintiff property tax exemptions, including up to the present time, using legal descriptions and surveys that precisely matched Plaintiff's 1910 deed and the corresponding tax lot designation.

85.     The Municipal Defendants' present attempt to disavow more than a century of their own acknowledgments is not only unlawful, but also directly contradicts the settled doctrine of practical location.

86.     For over 115 years, the Town and County have consistently recognized and acquiesced in Plaintiff's ownership, by entering into leases with Plaintiff, granting property tax

exemptions, designating the Property as a historic landmark, and soliciting Plaintiff's consent for potential acquisition.

87.     These repeated acknowledgments, coupled with Plaintiff's continuous, open, and exclusive possession, established the boundaries and ownership of the Property as a matter of practical location and long-standing acquiescence.

88.     The current administrative maneuver to repudiate that history and fabricate a claim of municipal ownership is thus not merely arbitrary and capricious, but an unconstitutional attempt to seize what Defendants have long conceded they do not own, without compensation or due process.

**CPSH Lease, Breach and Termination**

89.     On May 26, 2015, Plaintiff entered into what appeared to be a compatible arrangement: a rent-free lease agreement with CPSH, a non-profit entity, for use of a defined portion of Plaintiff's Property located at 1990 North Sea Road (the "Premises").

90.     The Premises forms part of, and lies wholly within, the larger Conscience Point parcel that is the subject of this action (the "Property"). The Lease contained explicit property descriptions referencing Plaintiff's Suffolk County Tax Map designation (SCTM 0900-060.00-02.00-007.000) and incorporated a certified 2015 survey prepared by Squires, Holden, Weisenbacher & Smith, annexed hereto as Exhibit A.

91.     That survey precisely delineated both the boundaries of Plaintiff's Property and the specific area leased to CPSH, thereby confirming that both parties recognized Plaintiff's fee ownership. Tellingly, the very same area defined in the Lease is now the portion Defendants seek to appropriate through their unlawful scheme

92. The Lease restricted use of the Premises exclusively to a nonprofit shellfish hatchery and educational facility, expressly prohibiting any subletting without Plaintiff's prior written consent.

93. As not-for-profit institutions, both Plaintiff and CPSH are legally bound by state and federal tax laws prohibiting it from authorizing commercial operations inconsistent with its charitable and historic mission. Such activities jeopardize Plaintiff's 501(c)(3) status, which CPSH disregarded by facilitating commercial aquaculture on the Property.

94. On or about March 2023, Plaintiff uncovered that CPSH had been unlawfully subletting portions of the Premises, without Plaintiff's knowledge or consent, to for-profit commercial shellfish enterprises, including West Robins Oyster Company, Inc. ("West Robins") and Shellworks, LLC ("Shellworks")(collectively referred to as "Commercial Subtenants") in direct violation of the Lease and Plaintiff's charitable mission.

95. Upon information and belief, CPSH also sublet portions of the Premises to the East End Explorer Camp, a for-profit waterfront children's program that charges families tuition for its for-profit programming.

96. CPSH, through its President Mark Matthews, approached Plaintiff's then-Executive Director seeking permission for what was presented as limited, nonprofit water quality improvements. In reality, Matthews and CPSH deliberately concealed their true intent to use the Premises for full-scale commercial shellfish operations and subleases.

97. CPSH's own filings and correspondence confirmed the scope of its misrepresentations. In its 2023 WQIP grant application, CPSH, through President Mark Matthews, admitted it was pursuing public funds not for limited nonprofit purposes, but to expand ongoing commercial operations, stating it intended "to allow our hatchery operations to

grow more and additional species of shellfish, sell shellfish seed at market prices, and enhance access to shellfish infrastructure at reasonable prices."

98.     The same application went further, revealing CPSH's broader business plan as "a necessity in attracting other growers." CPSH declared that it would "install a shellfish cooler and commercial ice making machine on our site that will be used by CPSH, Shellworks, and West Robins, two commercial shellfish growers who participate in the Suffolk County Aquaculture Lease Program (SCALP) and who currently pay us for dockage and storage space."

99.     Commercial Subtenant admissions corroborated this scheme: (i) in 2023, West Robins owner Will Peckham ("Peckham") disclosed he had been paying CPSH $7,200 annually since 2019; (ii) Matthews himself confirmed in writing that the Commercial Subtenants both paid rent and contributed labor and equipment while purchasing tens of thousands of oysters from CPSH; and (iii) Peckham further admitted that oysters grown and staged on the Premises were sold into retail distribution channels, including Whole Foods Market. Likewise, CPSH's WQIP application acknowledged that harvested oysters were sold not only to CSA members but also to "commercial customers, including restaurants, clubs, and retailers."

100.    These combined admissions eliminate any pretense: CPSH was not acting as a nonprofit tenant furthering conservation, but as a commercial landlord and wholesale supplier, monetizing Plaintiff's Property for profit-driven aquaculture enterprises and retail supply chains, in direct violation of the Lease and wholly incompatible with Plaintiff's nonprofit, tax-exempt mission.

101.    On December 12, 2023, the Southampton Town Board adopted Resolution RES-2023-1215, formally approving CPSH's application for $126,700 in CPF WQIP funds.

102.    This approval was tainted by conflicts of interest: Peckham, owner of West Robins, was a member of the Town's Water Quality Advisory Committee and, Defendant Pell, who also sat on the Committee ex-officio, upon information and belief, utilized his power and authority as an elected official to exercise influence over the Committee's deliberations and ultimate Town Board adoption.

103.    By leveraging their official positions and private business ties, Pell and Peckham steered taxpayer subsidies to enrich CPSH and its subtenants, cementing CPSH's unlawful occupancy and depriving Plaintiff of the benefit of its Property.

104.    This arrangement exemplifies the collusion, corruption, and self-dealing at the heart of Defendants' scheme: municipal officials and private beneficiaries working in concert to channel public funds into private gain at Plaintiff's expense.

105.    Furthermore, by underwriting CPSH's expansion into year-round revenue-generating shellfish sales and for-profit subletting, the Town contravened the express terms of Plaintiff's Lease and placed Plaintiff's 501(c)(3) status in jeopardy, while simultaneously enabling CPSH to act in violation of its own tax-exempt obligations, converting a charitable landmark into a municipally subsidized commercial enterprise.

106.    On October 16, 2024, Plaintiff's Executive Director, Sarah Kautz, sent written notice to Pell, explicitly advising him of what he already knew, that CPSH's pending WQIP application was unauthorized by Plaintiff's Board of Trustees (the "Letter").

107.    The Letter made plain that the application sought public funding to underwrite prohibited commercial activity on Plaintiff's Property, in violation of the Lease and Plaintiff's nonprofit mission and demanded that the Town halt any distribution of WQIP funds and deny related permits or approvals that would facilitate CPSH's unlawful expansion.

108.   This Letter placed Pell on explicit notice that the WQIP grant supported commercial activities lacking Plaintiff's consent.

109.   On October 31, 2024, Plaintiff, through counsel, issued a formal Lease Termination notice to CPSH (the "Termination Letter"), declaring termination based on incurable breaches, including unauthorized subletting and commercial operations.

110.   That same day, Matthews circulated the Termination Letter not only to CPSH's counsel Gilmartin, but also to Pell.

111.   The circulation of the Termination Letter revealed the coordination among Matthews, Gilmartin, and Pell, which soon escalated into a broader scheme to fabricate a Town ownership claim over Plaintiff's property designed to shield CPSH and its commercial subtenants and secure continued municipal funding.

112.   Instead of attempt to cure the breaches identified in the Termination Letter, on November 11, 2024, through Gilmartin, CPSH advised Plaintiff that they "reject the Colonial Society's unilateral attempt to 'terminate' the lease and has no intention of surrendering the property until the end of the lease."

113.   Tellingly, less than a month after Plaintiff issued the Termination Letter, the Town, through CPF, sent Plaintiff the November 22, 2024 Acquisition Letter. This timing was no coincidence: the Town acted immediately after Plaintiff moved to end CPSH's tenancy, revealing that its true interest was not historical preservation, but rather preserving CPSH's unlawful occupancy and the operations of its Commercial Subtenants.

114.   The Acquisition Letter was an admission against interest, expressly acknowledging Plaintiff's ownership of the Property and confirming that any municipal rights could only be obtained through purchase, not unilateral assertion of title.

115.    At the same time, the Acquisition Letter exposed the Town's motive, to shield CPSH and its Commercial Subtenants from eviction and to perpetuate their commercial use of Plaintiff's Property under the guise of a municipal acquisition. See Exhibit B.

116.    Plaintiff issued a second notice on November 25, 2024, advising CPSH that the Lease, already terminated for cause, would not be renewed beyond its expiration on December 31, 2024, thereby reaffirming that CPSH had no legal right to remain on the Premises.

117.    On December 24, 2024, after Plaintiff requested a date to conduct a walk-through of the Premises, Gilmartin, acting for CPSH, advised Plaintiff through its counsel that CPSH's Board had "renewed" the lease through December 31, 2029 and intended to fulfill its terms, thereby expressly acknowledging Plaintiff's title while at the same time attempting to prolong CPSH's unauthorized occupancy.

**Town Interference in the Eviction Proceeding**

118.    On January 21, 2025,  after CPSH refused to vacate Plaintiff's Property following the December 31, 2024 natural expiration of their lease, Plaintiff filed eviction proceedings to remove the CPSH and its holdover Commercial Subtenants, exercising its fundamental property right to exclude trespassers.

119.    At the February 5, 2025 eviction hearing, non-parties Burke and Pell burst into the courtroom alongside CPSH's Commercial Subtenants, West Robins owner, Peckham and Shellworks owner John "Barley" Dunne ("Dunne") and proceeded to interfere in the Eviction Holdover Proceeding.

120.    This spectacle, municipal officials marching into court beside private subtenants and falsely asserting Town ownership to prevent Plaintiff from exercising its rights to evict a holdover tenant, was a calculated corruption of judicial process. It demonstrated the Defendants'

willingness to conspire openly, under color of law, to obstruct a lawful eviction and to substitute political influence for legal rights.

121.    Using his official government position to interrupt judicial proceedings, Burke falsely declared that the Premises was owned by the Town of Southampton, despite the Town not being a party to the action.

122.    Under New York law, the Town Attorney is vested with authority to appear in litigation on behalf of the Town and to speak as its legal representative.

123.    His declaration in open court was therefore not a stray remark, but a formal pronouncement of municipal policy, wielded as a weapon to derail judicial process. Courts and opposing parties reasonably treat such pronouncements by the chief legal officer as binding expressions of municipal policy, made under color of state law.

124.    Burke and Pell knew their ownership claim was false. They solely relied on the 1925 Deed which by its terms, abandoned any further claims.

125.    Both Burke and Pell were aware that the 1910 conveyance vested title in Plaintiff and that for decades the Town itself acknowledged Plaintiff's ownership in leases, tax records, and licenses. They were further aware that the Plaintiff disregarded the Acquisition Letter and the Town's previous attempt to purchase the Property less than three months prior.

126.    By mischaracterizing the 1925 Deed as granting broader rights to Plaintiff's Property, Defendants knowingly disregarded its release language and fabricated a claim of Town ownership. Plaintiff's counsel reacted to Burke and Pell's appearance, noting that the Town was not a party to the proceeding and lacked standing to intervene.

127.    The Court allowed the Town to be heard over Plaintiff's objection but properly instructed that any ownership disputes required a separate quiet title action in Supreme Court under RPAPL Article 15.

128.    Defendants Burke and Pell improperly used their influence as municipal authorities to interfere in a judicial proceeding in a manner that no private citizen could, abusing their official positions to obstruct Plaintiff's lawful eviction action and protect CPSH and it's Commercial Subtenants. A clear example of the misuse of municipal authority to aid private parties.

129.    In March 2025, Plaintiff's counsel met with Burke to present detailed documentary evidence, including the Museum's 1910 Deed, surveys, and prior Town leases, all of which contradicted the Town's sudden and arbitrary ownership claim.

130.    Tellingly, after this meeting, Burke never followed up until after the Tax Map had already been changed and Plaintiff's counsel Emailed him on April 23, 2025, asking for an explanation.

131.    Burke's silence, upon information and belief, reflected not neglect but an active participation in a scheme of fraud: deliberately channeling the matter through bureaucratic processes to engineer a false tax map designation. That designation did not and could not lawfully convey ownership, but it created a cloud on Plaintiff's title and a fabricated record of municipal ownership that Defendants could weaponize against the Plaintiff notwithstanding its incontrovertible recorded deed.

**Administrative Manipulation of the Tax Map**

132.    Having been rebuffed in court, where the Judge correctly instructed that any ownership dispute must be resolved by a quiet title action in Supreme Court, Defendants Burke

and Pell, conspiring with CPSH's counsel Gilmartin, deliberately and openly admitted to pivoting away from the judicial forum, where they knew they could not prevail.

133.    Rather than pursue the lawful quiet title action, which would have required them to confront Plaintiff's recorded 1910 Deed, a century of acknowledgments, and the release language in the 1925 Deed, Defendants instead turned to the administrative arena, leveraging insider influence over the RPTSA to accomplish indirectly what they could not obtain in open court.

134.    This maneuver marked the beginning of a calculated scheme to manipulate the tax map, circumvent judicial process, and fabricate a false record of Town ownership without just compensation or due process.

135.    On or about April 22, 2025, the Town, purporting to act through its Assessor and Attorney, transmitted to the RPTSA materials curated by Gilmartin, including the February 10, 2025 Advantage Title report that, for the first time, claimed Town ownership of the Plaintiff's Property.

136.    Although the Town Attorney has no statutory power to adjudicate or alter ownership records, the County RPTSA relies on formal "ownership correction" submissions from Town officials to authorize amendments to tax maps.

137.    Defendants exploited this reliance, using the Town's official letterhead, noting Burke as Town Attorney and the imprimatur of the Town Assessor's office to cloak Gilmartin's advocacy documents with municipal authority.

138.    This action directly violated New York Real Property Tax Law § 503(1)–(2), which provides that county tax maps "shall be prepared and maintained from recorded

instruments and official surveys" and must accurately reflect "the dimensions and location of each separately assessed parcel."

139.    Likewise, RPTL § 504(3) mandates that assessment rolls and ownership information be "verified from recorded instruments and other lawful evidence of title" before being altered. New York Real Property Law § 291 further provides that duly recorded deeds, such as Plaintiff's 1910 conveyance, give constructive notice to the world and have priority over unrecorded claims. Finally, 9 N.Y.C.R.R. § 189.3(b) and § 189.7 require that any change to tax maps be supported by proper documentary evidence of record title and that affected owners be given notice and an opportunity to be heard before ownership designations are altered.

140.    Defendants ignored these statutory mandates and instead: (a) transmitted privately prepared title "certifications" from Advantage Title, obtained by CPSH's counsel Gilmartin, as if they were official Town determinations; (b) deliberately withheld Plaintiff's recorded deed, certified surveys, and public records of its unbroken chain of title; and (c) directed County officials to redraw the tax map on the basis of this one-sided submission.

141.    As a result, the County issued an altered tax map creating a new parcel designation (0900-060.00-02.00-009.000) in the Town's name, while simultaneously reducing Plaintiff's longstanding parcel (0900-060.00-02.00-007.000). This artificial reduction not only carved out nearly two acres of Plaintiff's Property but also attempted to recast them as municipally owned without judicial process. A true and correct copy of the altered April 2025 tax map is annexed hereto as Exhibit C.

142.    By these acts, Defendants exercised authority they did not possess, usurped the judicial function reserved for quiet title proceedings under RPAPL Article 15, and manufactured a false ownership designation without notice, hearing, or lawful due process.

143.     RPTSA officials acted despite knowing Plaintiff's deed was on record, deliberately circumventing required procedures to administratively decide title without notice or hearing.

144.     On April 23 and again on April 29, 2025, Burke admitted this circumvention, acknowledging that the Town had chosen not to file a quiet title action and had instead presented to County officials deeds for a different, adjacent parcel to claim ownership of Plaintiff's land.

145.     Most tellingly, the Town submitted to the County only a February 10, 2025 title report prepared by Advantage Title and ordered by Gilmartin (the "February Report"), while concealing an earlier January 31, 2025 report from the same company (the "January Report").

146.     The January Report listed two deeds of record for the tax parcel of the Property: (i) the 1910 Deed; and (ii) the 1925 Deed. The January Report expressly noted that each deed "covers part of premises," but did not discuss the overlap or ownership in detail other than providing supporting tax documents which reflect Plaintiff as owner.

147.     Less than two weeks later and after the Judge in the Eviction Proceeding directed the Town to file a Quiet Title action in Supreme Court, Gilmartin procured the February Report. The February Report, which contained the *exact same deed listings* as the January Report but added new prefatory language asserting: "The Town of Southampton is the last owner of record of the property described in Schedule A, and the Southampton Colonial Society is the last owner of record to the north."

148.     Schedule A of the February Report reproduced the metes and bounds description from the 1925 Deed and concluded that the Town owned to approximately 2 acres of Conscience Point, effectively re-casting the 1925 Deed conveyance as if it had displaced the earlier 1910

Reeve conveyance of Conscience Point itself. No new deeds, surveys, or recorded instruments were ever filed regarding the Museum's Property or could be cited to support this dramatic shift.

149.    The February Report relied solely on the same two historical deeds already acknowledged in January but imposed a new and unfounded interpretation of them without further reasoning. The only substantive difference between the January Report and the February Report was the insertion of the false claim of Town ownership, unsupported by any recorded instrument and a sudden appearance of Schedule A.

150.    The February Report's prefatory language is unsupported by law or record evidence: under New York Real Property Law § 291, the 1910 recorded deed to Plaintiff's predecessor remains paramount and cannot be extinguished or overlapped by the later limited purpose 1925 Deed.

151.    Upon information and belief, the February Report's assertion of Town ownership was not the product of independent title research but was inserted at Gilmartin's direction to manufacture a pretextual narrative of Town ownership where none exists.

152.    By submitting the February Report while concealing the January Report, Defendants intentionally misled RPTSA officials, substituting a manufactured claim of ownership in place of objective deed history. In doing so, they relied exclusively on the deeds filed on or before the 1925 deed, while deliberately disregarding and failing to acknowledge the century of subsequent recorded deeds and conveyances confirming Plaintiff's continuous, undisputed ownership of Conscience Point.

153.    This calculated manipulation of title reporting was designed to circumvent judicial process, to obstruct Plaintiff's eviction action, and to fabricate an administrative basis for altering the County Tax Map without due process or just compensation.

154.    The fabrication embedded in the February Report illustrates a deliberate scheme by Defendants to rewrite settled property records outside the judicial process, in violation of Plaintiff's vested property rights and controlling New York real property law. Rather than conduct independent municipal research, the Town abdicated its governmental responsibility and laundered Gilmartin's private advocacy through the County tax map process. In doing so, the Town abandoned its duty of objectivity and became a willing co-conspirator of CPSH's scheme.

155.    By placing the imprimatur of the Town Attorney's office on Gilmartin's submissions, Defendants conferred upon private counsel the mantle of state authority, effectively deputizing CPSH's lawyer to act under color of law.

156.    This transformation of private self-interest into official municipal policy is the very definition of arbitrary government action that violates due process.

157.    Plaintiff first learned of the altered tax map on or about April 22, 2025, not from the Town or County, but from the press, after Gilmartin announced the revised map to the Southampton Press.

158.    The fact that a private attorney, representing a tenant whose lease had been terminated, controlled the first public disclosure of an official County land record underscores the calculated secrecy and collusion underlying the scheme.

159.    Burke himself admitted, "While I was aware that the process was ongoing, I was not aware of final determination/changes until yesterday and apparently after David Gilmartin had already contacted the press".

160.    By allowing a private lawyer to control the process and first public disclosure of official County land records, Defendants concealed the scheme from the Plaintiff, the Property's owner, abused governmental power, and engaged in conduct that is conscience-shocking,

arbitrary, and oppressive in violation of substantive due process. Such conduct transgresses the "decencies of civilized conduct" and constitutes arbitrary and oppressive action in violation of substantive due process.

**Defendants' Governmental Influence and Abuse of Authority**

161.    Almost at the exact same date as the Tax Map alteration, upon information and belief, on or about April 21, 2025, Matthews appeared before the Trustees in Executive Session seeking support for the release of the $126,700 WQIP grant funds, which were previously approved, to begin commercial development of Plaintiff's property.

162.    This was not a neutral request; the timing occurred with inside knowledge of Defendants Burke and Pell implementing the administrative map change purporting to transfer ownership of Plaintiff's Property to the Town.

163.    Days later, Burke publicly doubled down, telling the *Southampton Press* that "according to the Town historian's research and verified by counsel to the title company and the RPTSA, the Town is the owner of the southern portion of the Conscience Point property in question."

164.    Burke's statement was not casual commentary, but an official pronouncement of Town ownership made in his capacity as Town Attorney, therefore constituted a formal expression of Town policy, not merely an individual opinion.

165.    These public acts demonstrate that Defendants were not relying on judicial process, but on the contrived legitimacy of an administrative manipulation to assert ownership over Plaintiff's Property.

166.    The scheme was effective only because Burke and Pell wielded the power of their offices to transform CPSH's private dispute into official government action under color of state law.

167.    The conspiracy succeeded precisely because each Defendant wielded influence that, when combined, created a closed circle of power: (i) Matthews pressed CPSH's private agenda to expand for-profit activities, (ii) Gilmartin supplied documents containing misrepresentations, (iii) Pell opened the doors of municipal access to both Matthews and Gilmartin, and (iv) Burke affixed the Town's official seal of authority. This insular and self-serving conspiracy, driven by private gain and political favoritism, exemplifies the corruption substantive due process forbids.

168.    Together, they manufactured the appearance of lawful government action while concealing from the public and the courts that the entire scheme originated in private commercial self-interest.

169.    No private citizen could have engineered such a brazen taking. It was only through the coordinated exercise of municipal authority, deliberately circumventing statutory and judicial safeguards, that Defendants were able to strip Plaintiff of its vested property rights, deprive them of due process and divert them to private commercial beneficiaries.

170.    Under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), their actions are properly attributable to the Town of Southampton because they reflect official policy and the deliberate choices of officials with final authority in the areas of land ownership, property records, and municipal representation.

**Continuing Harm, Public Statements, and Disparate Treatment**

171.    On August 2, 2025, CPSH publicly acknowledged that the Town "assured us that there will always be a place for us on Town property" and further stated "we are still selling oyster seed to commercial shellfish growers."

172.    Upon information and belief, shortly thereafter, CPSH took down its website, removing prior public representations of its for-profit partnerships and subtenancy arrangements. The timing of this removal, following Plaintiff's eviction action and public scrutiny, demonstrates an effort to conceal evidence of its commercial activities inconsistent with its 501(c)(3) tax-exempt status.

173.    Because CPSH operates from Plaintiff's Property, these statements reveal: (a) CPSH's continued reliance on the Town's false ownership claim; (b) ongoing improper coordination between Town officials, CPSH, and Gilmartin; and (c) the Town's express promise to guarantee CPSH's continued occupation of Plaintiff's land regardless of the eviction outcome or Plaintiff's recorded deed.

174.    These admissions demonstrate the concrete harm flowing from Defendants' failure to provide constitutionally required notice and hearing before altering official property records, as they enabled CPSH to cloak its unlawful tenancy under the protection of municipal authority.

175.    Municipal Defendants provided no compensation to Plaintiff for this governmental appropriation effectuated through the exercise of state authority unavailable to private citizens, thereby violating the Takings Clause as well as due process protections.

176.    Acting under color of state law, Burke and Pell used their offices to obstruct eviction, manipulate records, and announce official ownership claims, while Gilmartin and

Matthews laundered private interests through municipal authority. CPSH further acted jointly with the Town by soliciting funds, slandering Plaintiff's title, and occupying the Property under false municipal protection.

177.    As a direct result of Defendants' coordinated use of governmental authority, Plaintiff has suffered and continues to suffer ongoing deprivation of constitutional property rights, including: (a) clouded title preventing exercise of core ownership rights; (b) inability to exclude unauthorized commercial operators; (c) continued illegal commercial operations threatening Plaintiff's 501(c)(3) status; (d) interference with its historic and educational mission; and (e) forced expenditure of resources to defend property rights long recognized under the law.

178.    Defendants coordinated actions have further damaged Plaintiff's reputation, deterred donors, and undermined Plaintiff's ability to lease or otherwise monetize the Property. Plaintiff lost pledged donations and was forced to expend staff time and resources defending its ownership and charitable mission.

179.    Similarly situated nonprofit cultural institutions, such as the Parrish Art Museum and the Southampton Cultural Center, hold recorded deeds and receive municipal cooperation, tax exemptions, and leases. Upon information and belief, neither has had its title clouded or ownership administratively altered.

180.    Plaintiff, alone among historic nonprofit landowners in Southampton, was subjected to the extraordinary step of having its deeded title stripped through an ex parte administrative alteration, while every other comparable organization continued to enjoy unchallenged ownership and full municipal recognition.

181.    Plaintiff was targeted for any legitimate reason but because Defendants' private, financial, and political interests were uniquely entangled with CPSH's continued occupation, and

also because municipal actors Burke and Pell, together with Gilmartin and Matthews, wielded their official authority and political influence to advance those private interests at Plaintiff's expense.

182.    Such disparate treatment was irrational, arbitrary, and transparently motivated by favoritism toward CPSH and its private partners, placing Plaintiff in a "class of one" for purposes of equal protection under the Fourteenth Amendment.

183.    Defendants' actions, jointly undertaken under color of state law, deprived Plaintiff of notice, hearing, and compensation, appropriated its land for public and commercial use, and insulated CPSH from eviction.

184.    These constitutional violations are ongoing and continue daily, as the result of this conspiracy remains in effect, unauthorized commercial operations continue under protection of false governmental ownership claims, and Defendants continue to assert official ownership through governmental authority, all without due process as required by the Fourteenth Amendment.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**

**Violation of Procedural Due Process - 42 U.S.C. § 1983 (Fourteenth Amendment) Against Defendants Town of Southampton; County of Suffolk; James Burke (individual and official capacities); William Pell (individual and official capacities); Mark Matthews (individually and as President of CPSH); Conscience Point Shellfish Hatchery Corp. ("CPSH"); and David Gilmartin (individually and as Partner at Greenberg Traurig LLP).**

185.    Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

186.    Plaintiff possesses a constitutionally protected property interest in the Property by virtue of its 1910 Deed and more than a century of continuous possession and governmental recognition.

187.    The Fourteenth Amendment prohibits deprivation of property without due process of law, which minimally requires notice reasonably calculated to apprise the owner of the proposed deprivation and a meaningful opportunity to be heard before a neutral decisionmaker.

188.    Defendants deprived Plaintiff of its Property without the notice and neutral adjudication required by RPTL §§ 503–504, RPL § 291, and 9 N.Y.C.R.R. pt. 189, which mandate verification of ownership from recorded instruments, and, where ownership is impacted, notice and an opportunity to respond before altering official tax-map ownership designation.

189.    On April 22, 2025, Burke, Pell, and Gilmartin induced RPTSA to amend the tax map ex parte, both deliberately ignoring Plaintiff's recorded 1910 Deed, in direct contravention of statutory requirements under RPTL § 503 and long-established constitutional safeguards.

190.    RPTSA acted with full knowledge of Plaintiff's recorded 1910 Deed and superior ownership rights, yet, in lockstep with the Town and Gilmartin, implemented the false submissions as part of a coordinated plan. This was not mere bureaucratic oversight but a calculated maneuver to administratively adjudicate ownership and confer title on the Town outside of judicial process.

191.    Burke and Pell, in their official and individual capacities, initiated, directed, approved, and ratified the alteration. They acted with actual knowledge that they lacked statutory or judicial authority to adjudicate title, and nevertheless conspired with Gilmartin to accomplish, through administrative manipulation, what they knew could never be achieved in open court.

192.    As final municipal policymakers in their respective roles, their conduct constitutes official policy attributable to the Town under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

193.    Defendants Matthews, CPSH, and Gilmartin, acted jointly with municipal officials, by advancing knowingly false ownership claims to Town and County personnel, supplying manufactured title reports that deliberately ignored controlling deed evidence, and orchestrating the false tax map change. By jointly implementing governmental action, they crossed the line from private advocacy into state action, thereby acting under color of state law for purposes of 42 U.S.C. § 1983.

194.    The Town and County, through officers, employees, and formal acts, knowingly implemented and ratified the tax map alteration without providing Plaintiff the most basic procedural safeguards: no notice of the proposed change, no opportunity to present evidence of its deeded ownership, and no access to the judicial forum uniquely empowered to adjudicate title.

195.    By these acts and omissions, Defendants deprived Plaintiff of constitutionally required due process: notice reasonably calculated to apprise it of the threatened deprivation, an opportunity to be heard at a meaningful time and in a meaningful manner, and adjudication of ownership before a neutral tribunal rather than by ex parte administrative fiat.

196.    As a direct and proximate result of Defendants' coordinated conduct, Plaintiff has suffered concrete and ongoing harms, including dispossession and interference with possessory rights, a clouded title preventing leasing or development, disruption of pending eviction proceedings, reputational injury, the loss of donors and grant funding, diminished rental opportunities, and diversion of resources away from Plaintiff's educational and historic mission toward costly litigation to vindicate its rights.

## SECOND CLAIM FOR RELIEF

**Violation of Substantive Due Process - 42 U.S.C. § 1983 (Fourteenth Amendment) Against All Defendants**

197.    Plaintiff repeats and realleges all prior paragraphs.

198.    Plaintiff's vested ownership rights are a fundamental property interest protected by the Due Process Clause.

199.    Defendants, acting under color of state law, engaged in conduct that was arbitrary, irrational, and wholly devoid of legitimate governmental purpose.

200.    Defendants deliberately bypassed judicial process, manipulated title reports, and engineered a false tax map amendment in order to transfer ownership from Plaintiff to the Town, despite clear record evidence establishing Plaintiff's title.

201.    This calculated misuse of municipal power to advance private commercial interests is the very type of conduct substantive due process forbids.

202.    Burke's admission that the Town's "process…was not to bring a quiet title action" but instead to alter the tax map administratively is direct evidence of deliberate bad faith and deliberate circumvention of judicial safeguards.

203.    As Town Attorney and the municipality's final legal policymaker, Burke confessed that the Town intentionally circumvented judicial safeguards in order to deprive Plaintiff of property rights without lawful process.

204.    Pell's assurances to Matthews that "the Town would intervene," coupled with his policymaking authority as a Councilmember and former Trustee, demonstrate intentional misuse of official power. Pell's intervention was not incidental but a calculated exercise of authority to aid CPSH and its subtenants at Plaintiff's expense.

205.    Matthews and CPSH furthered this scheme by soliciting donations and reassuring supporters with knowingly false statements such as, "the Town owns the property … and has assured us that there will always be a place for us on Town property." These declarations illustrate how CPSH relied on and perpetuated the Town's false ownership claim to entrench its unlawful occupation and solicit financial support under false pretenses.

206.    The Town and County ratified and institutionalized these actions as official municipal decisions, endorsing the unlawful deprivation of Plaintiff's property rights. By adopting Burke and Pell's directives and implementing Gilmartin's submissions, the municipalities converted private advocacy into official policy, satisfying *Monell*.

207.    Defendants' conduct lacked any conceivable legitimate governmental purpose, reflected favoritism toward CPSH, was motivated by intertwined private interests, and was undertaken in bad faith to obstruct Plaintiff's property rights and defeat its lawful eviction proceeding.

208.    Such conduct is so arbitrary and egregious that it "shocks the conscience" and constitutes an abuse of governmental power prohibited by the Fourteenth Amendment's substantive due process guarantee.

209.    As a direct and proximate result, Plaintiff has been deprived of the most fundamental "sticks" in the bundle of property rights, including exclusive possession, the right to exclude trespassers, and the quiet enjoyment of its land. Plaintiff has also suffered reputational harm, loss of donors and grants, and threats to its nonprofit mission, all flowing from Defendants' conscience-shocking abuse of governmental power.

### THIRD CLAIM FOR RELIEF

### Taking Without Just Compensation - 42 U.S.C. § 1983 (Fifth & Fourteenth Amendments) Against All Defendants

210.    Plaintiff repeats and realleges all prior paragraphs.

211.    Plaintiff holds a vested and constitutionally protected interest in the Property grounded in its 1910 recorded deed, more than a century of continuous possession, and consistent governmental recognition of its ownership.

212.    The Takings Clause, applicable to the States through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

213.    Defendants effected a constructive taking by inducing and directing the County RPTSA to amend the tax map to designate the Town as owner, and then treating that administrative entry as a de facto transfer of ownership enabling municipal and private use of the Property in disregard of Plaintiff's recorded title.

214.    Defendants' conduct effected (a) a physical taking, by maintaining CPSH's and its commercial subtenants occupation of the Property and excluding Plaintiff from possession; (b) a regulatory taking, by stripping Plaintiff of its right to exclude others, lease, or otherwise control the Property's use; and (c) a constructive taking, by clouding title and converting administrative designations into an asserted transfer of ownership.

215.    Although a tax map entry does not itself convey legal title, Defendants exercised governmental authority as if it did, clouding Plaintiff's title, obstructing its right to exclusive possession, and interfering with its control and stewardship of the Property.

216.    Defendants Burke and Pell, acting in both official and individual capacities, caused, approved, and ratified the alteration knowing it lacked lawful basis. As the Town's chief

legal officer and elected policymaker, their actions constitute final municipal policy attributable to the Town under *Monell.*

217.    Defendants Matthews and CPSH advanced false ownership claims, solicited municipal support, and benefited directly from Plaintiff's dispossession through continued occupation and receipt of public grant funds.

218.    Defendant Gilmartin materially furthered the taking by ordering, procuring, and submitting title reports that omitted controlling deed evidence, which were then adopted by Town and County officials as the basis for official action.

219.    Each individual Defendant acted jointly with municipal officials, exercising powers available only under color of state law, thereby transforming private advocacy into state action.

220.    The Town and County ratified and implemented the altered tax map designation as though it were dispositive of ownership. They used it to release public funds for projects on the Property, authorize development and environmental initiatives inconsistent with Plaintiff's ownership, and obstruct Plaintiff's eviction proceedings against CPSH demonstrating their treatment of the alteration as a transfer of ownership.

221.    Neither the Town nor the County initiated lawful condemnation proceedings or tendered just compensation.

222.    Instead, Defendants effectuated a taking through administrative manipulation and false public declarations of ownership, depriving Plaintiff of its property rights outside lawful procedures.

223.    Plaintiff's takings claim is ripe immediately upon deprivation without compensation; exhaustion of state remedies is not required.

224. Plaintiff has received no compensation and has suffered continuing harm, including dispossession, loss of control, clouded title, interference with its historic and educational mission, reputational injury, loss of donors and grants, and obstruction of lawful management of its Property.

## FOURTH CLAIM FOR RELIEF

### Equal Protection (Class-of-One) - 42 U.S.C. § 1983 (Fourteenth Amendment) Against All Defendants

225. Plaintiff repeats and realleges all prior paragraphs.

226. Defendants, acting under color of state law, intentionally treated Plaintiff differently from similarly situated nonprofit cultural and historic landowners holding recorded deeds in Suffolk County, by altering ownership recognition for Plaintiff's Property via administrative tax map change without notice, hearing, or judicial process. No other similarly situated nonprofit has been subjected to such treatment.

227. Similarly situated deed-holding nonprofit cultural institutions in Southampton, including the Parrish Art Museum and the Southampton Cultural Center, have not had their recorded titles altered by ex parte administrative tax-map changes and continue to receive routine municipal cooperation.

228. Defendants Burke and Pell approved, directed, and ratified the alteration specifically targeting Plaintiff's Property despite more than a century of continuous municipal recognition of Plaintiff's ownership, clear recorded title, and no lawful basis to single out Plaintiff for adverse treatment.

229. Defendants Matthews and CPSH conspired with municipal officials to advance false ownership claims and secure favorable treatment; Defendant Gilmartin facilitated the

41

scheme by procuring and supplying false legal assertions adopted by officials. Through this joint action with municipal actors, these private Defendants acted under color of state law.

230.    The Town and County, through final policymakers Burke and Pell and through formal acts of their agencies, acted pursuant to official decisions and practices that recognized CPSH and Town interests while denying Plaintiff the equal protection routinely afforded to other recorded owners. These acts constitute official municipal policy under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

231.    The selective treatment was irrational, arbitrary, and devoid of legitimate governmental purpose. It was motivated by favoritism toward CPSH and entanglement with Defendants' private commercial interests, undertaken with the unlawful goal of blocking Plaintiff's lawful eviction efforts and entrenching CPSH's occupation.

232.    Plaintiff was intentionally treated differently from others similarly situated, and there exists no rational basis for this disparate treatment. Defendants' conduct places Plaintiff squarely within the "class of one" equal protection doctrine.

**Selective Enforcement Theory**

233.    In addition, Defendants selectively enforced or manipulated municipal and county procedures against Plaintiff while declining to apply the same standards to similarly situated nonprofits such as the Parrish Art Museum and the Southampton Cultural Center. Whereas those institutions have been left undisturbed in their recorded ownership, Plaintiff alone was targeted for administrative alteration of title and subjected to intervention in its private leases and eviction proceedings.

234.    This selective enforcement was based not on neutral principles, but on favoritism toward CPSH, conflicts of interest, and political influence. Defendants deliberately chose to

enforce procedures against Plaintiff that they deliberately chose not to apply to others similarly situated, thereby violating equal protection.

235.    Whether viewed under the "class of one" theory or as selective enforcement, Defendants' disparate treatment of Plaintiff was arbitrary, irrational, and motivated by private favoritism, lacking any legitimate governmental justification.

236.    As a direct and proximate result, Plaintiff has suffered clouded title, interference with possession and use, reputational harm, loss of donor and grant support, diversion of resources from its charitable mission to costly litigation, and continuing exposure to unlawful municipal action.

### FIFTH CLAIM FOR RELIEF

**Municipal Liability - 42 U.S.C. § 1983 (Monell)**
**Against Defendants Municipal Defendants.**

237.    Plaintiff repeats and realleges all prior paragraphs.

238.    The constitutional deprivations alleged in the First through Fourth Claims were caused by the Town's and County's official policies, customs, and decisions of final policymakers, and/or by their ratification of unconstitutional conduct.

239.    The Town, acting through its Board, Supervisor, Assessor's office, and Town Attorney, and the County, acting through its RPTSA and responsible officials, maintained and applied a policy, practice, and custom of using administrative mechanisms, including tax maps and assessor records, to assert or reassign ownership interests in lieu of judicial quiet title proceedings. This practice, though improper, was ratified and applied as an official municipal decision in Plaintiff's case. Yet unlike other similarly situated property owners, who are required to resolve disputes exclusively through judicial quiet title actions, Plaintiff alone was singled out for administrative dispossession. This selective treatment, without any rational basis, not only

establishes municipal policy and ratification under *Monell*, but also supports Plaintiff's "class of one" equal protection claim under 42 U.S.C. § 1983.

240.    Defendant Burke, as Town Attorney, and Defendant Pell, as Councilman and former Trustee, acted with final policymaking authority for the Town concerning ownership assertions, property records, and land management, or, alternatively, their actions were expressly approved and ratified by final policymakers on the Town Board. County officials with final authority at the RPTSA likewise approved and implemented the change.

241.    Both the Town and the County ratified unconstitutional conduct by knowingly adopting and enforcing the altered tax map as operative, disbursing public funds for CPSH projects, obstructing Plaintiff's eviction action, and treating Plaintiff as dispossessed despite clear record ownership.

242.    These policies, customs, and ratifications were the moving force and direct and proximate cause of Plaintiff's deprivations of due process, equal protection, and just compensation within the meaning of *Monell.*

### SIXTH CLAIM FOR RELIEF

### Declaratory Judgment - 28 U.S.C. § 2201
### Against All Defendants.

243.    Plaintiff repeats and realleges all prior paragraphs.

244.    An actual, ripe, and justiciable controversy exists regarding the lawful ownership of the Property; Defendants' actions have already impaired Plaintiff's rights and continue to cloud title.

245.    Plaintiff holds valid recorded title dating to 1910 and has continuously exercised ownership rights recognized in municipal and county records.

246.    Acting individually and in concert, Defendants have asserted false and adverse ownership claims by directing and approving tax-map alterations listing the Town as owner, issuing public and administrative statements to the same effect, and interfering with Plaintiff's eviction proceedings while attempting to authorize projects on the Property.

247.    These adverse claims create a cloud on title and substantial uncertainty regarding Plaintiff's property rights.

248.    A declaratory judgment is necessary to resolve the controversy, confirm Plaintiff's title, and prevent ongoing and future interference. Plaintiff seeks a declaration that it is the sole lawful owner of the Property; that Defendants' adverse claims and administrative alterations are void and without legal effect; and that Defendants are barred from relying on or reasserting adverse ownership claims inconsistent with Plaintiff's recorded title.

## SEVENTH CLAIM FOR RELIEF

### Quiet Title - RPAPL § 1501
### Against Defendants Municipal Defendants, Matthews; and CPSH.

249.    Plaintiff repeats and realleges all prior paragraphs.

250.    Plaintiff holds clear recorded title to the Property by deed filed in 1910, supported by more than a century of continuous ownership, possession, and governmental recognition.

251.    Defendants claim an adverse estate or interest in the Property without lawful basis, relying on altered tax map entries, extra-judicial statements, public funding approvals, and CPSH's continued unlawful possession to purport to establish Town ownership.

252.    These adverse claims constitute a cloud on Plaintiff's title, impairing its right to exclusive possession, control, and beneficial use, and undermining Plaintiff's ability to manage, lease, or preserve the Property consistent with its nonprofit mission.

253.    Pursuant to RPAPL § 1501, Plaintiff seeks judgment declaring that it is the sole

lawful owner of the Property; declaring Defendants' adverse claims null, void, and without legal

effect; directing the removal of the cloud created by Defendants' assertions and administrative

alterations; and permanently enjoining Defendants from asserting any adverse ownership interest

or interfering with Plaintiff's title and possession.

## EIGHTH CLAIM FOR RELIEF

### Slander of Title - New York Common Law
### Against All Defendants

254.    Plaintiff repeats and realleges all prior paragraphs.

255.    Defendants published false statements disparaging Plaintiff's title by: (a)

recording and disseminating altered tax map ownership designations for the Property; (b)

asserting municipal ownership in official records, submissions, and communications; (c) making

false ownership claims in judicial and administrative proceedings; and (d) repeating such

falsehoods in public statements and grant-related documents.

256.    Defendants acted with malice and in reckless disregard for the truth. They knew,

or should have known, that Plaintiff's recorded 1910 Deed, unbroken chain of title, and decades

of municipal recognition established Plaintiff's ownership, yet they deliberately disseminated

contrary assertions to cloud Plaintiff's title and obstruct its property rights.

257.    On May 28, 2025, Defendant Burke, in his capacity as Town Attorney, told the

*Southampton Press* that "the Town is the owner of the southern portion of the Conscience Point

property," despite his actual knowledge, based on the 1910 Deed, municipal leases, and prior

acknowledgments, that Plaintiff owned the parcel.

258.    On August 2, 2025, Defendant Matthews publicly stated that CPSH "was assured

by the Town that there will always be a place for us on Town property" and further

acknowledged that CPSH "is still selling oyster seed to commercial shellfish growers," thereby reinforcing the false claim of municipal ownership and its supposed entitlement to remain.

259.    These statements were widely circulated in local media, relied upon by donors and granting agencies, and amplified through CPSH's communications.

260.    As a direct and proximate result of Defendants' false publications, Plaintiff incurred special damages, including but not limited to, attorneys' fees and costs to remove the cloud on title and defend its ownership; disruption and diversion of resources from its historic and educational mission; loss of pledged donations; withholding of grant funds; reputational harm in the community; and interference with its eviction proceedings against CPSH.

### NINTH CLAIM FOR RELIEF

### Fraud - New York Common Law
### Against All Defendants

261.    Plaintiff repeats and realleges all prior paragraphs.

262.    Defendants knowingly made false, material representations that the Town, not Plaintiff, owned the Property. These misrepresentations were made in judicial proceedings, in submissions to the Suffolk County RPTSA, in Town communications, and in public statements, with the intent to deceive governmental decisionmakers, donors, and the public; to induce reliance by County and Town officials; and to deprive Plaintiff of its property rights and institutional support.

263.    In February 2025, Defendant Gilmartin submitted to Suffolk County a February 10, 2025 Advantage Title report falsely asserting that the Town owned Plaintiff's property, while concealing a January 31, 2025 report from the same firm. On February 5, 2025, Defendants Burke and Pell represented to the District Court that "the Town owns Conscience Point," despite

actual knowledge of the 1910 Deed, certified surveys, and decades of Town leases acknowledging Plaintiff's ownership.

264.     On May 28, 2025, Burke repeated to the *Southampton Press* that "the Town is the owner of the southern portion" of the Property, with the deliberate purpose of misleading the public, discouraging Plaintiff's supporters, and undermining Plaintiff's donor and grant base by portraying the ownership dispute as already resolved in the Town's favor.

265.     Defendants knew these statements were false when made. They had direct access to the 1910 Deed, the chain of title, the Town's prior leases acknowledging Plaintiff's ownership, and the 1925 Deed's express release language. The statements were made with actual knowledge of falsity or with reckless disregard for the truth.

266.     The County and other third parties relied on these misrepresentations. The Suffolk County RPTSA adopted the altered February 2025 report in April 2025, amending the tax map to show Town ownership.

267.     The Town subsequently authorized release of public funds to CPSH projects premised on Town ownership. Donors and grant agencies, upon being told that "the Town owns Conscience Point," withheld or rescinded funding to Plaintiff in reliance on these misrepresentations.

268.     Defendants Matthews and CPSH further perpetuated the scheme by publicly asserting that CPSH was assured of a permanent place on "Town property," soliciting funds and support on the false premise that Plaintiff no longer owned the land.

269.     As a direct and proximate result of Defendants' fraudulent scheme, Plaintiff suffered damages including: (a) loss of exclusive control and use of its Property; (b) significant attorneys' fees and expenses to defend its title; (c) reputational harm and diminished standing in

the community; (d) lost pledges and withheld grants; and (e) diversion of staff time and

institutional resources from Plaintiff's historic and educational mission to costly litigation.

## TENTH CLAIM FOR RELIEF

### Civil Conspiracy - New York Common Law (Derivative)
### Against Defendants Matthews; CPSH; Gilmartin; Burke; and Pell.

270.    Plaintiff repeats and realleges all prior paragraphs.

271.    Defendants knowingly entered into an agreement and common plan to interfere

with Plaintiff's vested property rights and to advance CPSH's private commercial interests and

the Town's political interests at Plaintiff's direct expense.

272.    In furtherance of the agreement, Defendants committed multiple overt acts,

including but not limited to: (a) procuring, concealing, and submitting the falsified February

2025 Advantage Title report; (b) inducing the County RPTSA to alter the tax map to list the

Town as owner; (c) making false ownership statements in court, administrative submissions,

public communications, and the press; (d) coordinating to obstruct Plaintiff's eviction

proceedings and maintain CPSH's unlawful occupation; and (e) leveraging municipal and

County resources, including grant funding, infrastructure approvals, and enforcement discretion,

to entrench CPSH's occupation of the Property.

273.    This conspiracy proximately caused Plaintiff's injuries by producing and

amplifying the independent torts and constitutional violations alleged herein, including fraud,

slander of title, and violations of 42 U.S.C. § 1983.

274.    Plaintiff seeks damages commensurate with those injuries, together with punitive

damages to deter future abuses of governmental authority undertaken in concert with private

commercial actors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against all Defendants, jointly and severally where applicable, and grant the following relief:

275.    A declaration pursuant to 28 U.S.C. § 2201 that (i) Plaintiff is the sole lawful owner of the parcel located at 1640 Conscience Point Road, Southampton, New York; (ii) Defendants' alteration of the Suffolk County Tax Map, and all related public filings or statements designating the Town of Southampton as owner, are unlawful, void, and of no legal effect; and (iii) Defendants' acts, including alteration of records, publication of false ownership claims, and interference with Plaintiff's possession and use, violated Plaintiff's rights under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983.

276.    A judgment pursuant to RPAPL § 1501 quieting title in Plaintiff's favor, declaring Defendants' adverse claims null and void, and directing correction of all municipal and County records to reflect Plaintiff's ownership.

277.    A temporary restraining order and preliminary injunction enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing, relying upon, or acting pursuant to the April 22, 2025 tax map alteration, or otherwise interfering with Plaintiff's vested property rights, pending the final resolution of this action;

278.    A permanent injunction (i) prohibiting Defendants from altering or publishing ownership records inconsistent with Plaintiff's recorded deed; (ii) prohibiting Defendants from interfering with Plaintiff's exclusive possession, control, and use of the Property; (iii) prohibiting Defendants from obstructing Plaintiff's lawful eviction and removal proceedings against CPSH or its agents; and (iv) requiring Defendants to take corrective action to restore the Suffolk County Tax Map and all related public databases to reflect Plaintiff's ownership.

279.   Monetary relief in an amount to be determined at trial, including but not limited to:

a.   Compensatory damages for loss of exclusive possession, clouded title, lost use of the Property, interference with Plaintiff's educational and charitable mission, and reputational harm;

b.   Nominal damages for violation of Plaintiff's constitutional rights;

c.   Consequential damages for losses flowing from Defendants' conduct, including lost grant opportunities, lost fundraising, and lost rental or occupancy value;

d.   Special damages for slander of title, including attorneys' fees and litigation costs incurred to remove the cloud on title, disruption of Plaintiff's historic and educational mission, impairment of financing or grant eligibility, and reputational harm;

e.   Compensatory damages for fraud, including out-of-pocket losses, consequential harm to Plaintiff's mission, and impairment of institutional integrity; and

f.   Punitive damages against the individual Defendants for willful, malicious, and reckless disregard of Plaintiff's constitutional and common-law rights.

280.   An order requiring Defendants to disgorge or make restitution of any public funds, including Community Preservation Act grant funds, released, authorized, or expended on the Property based on the false ownership designation, and to restore such funds for lawful use.

281.   An award of Plaintiff's reasonable attorneys' fees, expert costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and applicable state law.

282.   Such other and further relief, at law or in equity, as the Court deems just, proper, and necessary to redress Defendants' unlawful conduct and to protect Plaintiff's vested property rights.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Southampton

History Museum hereby demands a trial by jury on all issues so triable in this action.


Dated: September 8, 2025

New York, New York

                    Respectfully submitted,


                    By: __/s/ Sheila M. Tendy_____
                    Sheila M. Tendy, Esq.
                    **TENDY LAW OFFICE LLC**
                    Attorneys for Plaintiff
                    Southampton History Museum
                    176 North Sea Road
                    Southampton, New York 11968
                    Tel.: (212) 313-9504
                    Email: stendy@tendylaw.com